IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-00278-01-CR-W-BP |
| | ) | |
| TAMOND E. THOMAS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Pending is Defendant Tamond E. Thomas's Motion to Suppress, which was filed on March 25, 2021. Doc. 50. The Government filed Suggestions in Opposition on April 22, 2021. Doc. 58. Defendant did not file a reply, and the time for doing so has passed. L.R. 7.0(c)(3). For the reasons set forth below, the undersigned recommends Defendant's motion to suppress be DENIED.

### I. BACKGROUND

On August 29, 2019, the grand jury returned an indictment charging Defendant with being a felon in possession of a firearm. Doc. 11. The alleged offense involves a firearm seized from Defendant after his belongings were searched by law enforcement on August 7, 2019. Defendant argues he was unlawfully detained and did not consent to the search, and thus, the evidence seized and his statements to law enforcement should be suppressed. *See* Doc. 50.

On June 30, 2021, the undersigned held an evidentiary hearing on Defendant's motion to suppress. Doc. 64. Defendant was present and represented by counsel, Chase Higinbotham. The Government was represented by Assistant United States Attorney Emily Morgan. At the hearing, three witnesses testified: now-retired Detective Paul Williams, Detective Antonio Garcia, and Detective Justin Crump. In addition, twenty-seven exhibits were admitted into evidence. Doc. 65.

## II. FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following findings of fact:

1. On August 7, 2019, three Kansas City, Missouri Police Department ("KCPD") detectives assigned to the Missouri Western Interdiction Taskforce ("MoWIN") were conducting interdiction enforcement at the Greyhound Bus Station, 1101 Troost Avenue, Kansas City, Missouri (hereinafter, "Kansas City bus station"). Tr.[1] at 5-8, 10-11, 49, 52-53, 75, 81, 85-87, 90-91, 93-94. Detectives Paul Williams, Antonio Garcia, and Justin Crump wore plain clothes, and their badges and firearms were concealed. Tr. at 9-11, 75-76, 84-85, 87, 92-93.

2. Detectives assigned to the MoWIN attempt to interdict individuals carrying large amounts of narcotics, illegal firearms, or sizable quantities of illegal currency. Tr. at 7. Generally, detectives will observe individuals for suspicious or nervous behavior, approach those individuals to engage in a consensual contact, ask general questions, and request consent to search their bags. Tr. at 8. If an individual declines to speak with a detective or does not consent to a search of his or her bags, the individual is free to go. Tr. at 8, 44-45.

3. In their experience, law enforcement witnessed large amounts of illegal drugs traveling from the West Coast to the East Coast and significant sums of illegal currency traveling from the East Coast to the West Coast. Tr. at 8-9, 83. Officers previously made numerous arrests and seizures from the bus routes between New York and Los Angeles. Tr. at 11, 83, 86.

4. On the morning of August 7, 2019, a bus that originated in New York, which had stopped in St. Louis, arrived at the Kansas City bus station. Tr. at 10-11. Detective Williams, who was positioned inside the Kansas City bus station, observed a male, later identified as Defendant,

---

[1] "Tr." refers to the Transcript of Hearing on Motion to Suppress. Doc. 68.

exit the bus, and after taking a few steps, pause on the platform. Tr. 11-12, 16; Gov't Exs. 1-2. Defendant wore a hat pulled down in such a way that Detective Williams believed Defendant was attempting to conceal that he was looking around. Tr. at 58-59. In addition, Defendant tilted his head downward to look under the brim of his hat, and he rapidly shifted his eyes from side to side. Tr. at 12, 58-59, 77. In the detective's opinion, Defendant was scanning the crowd looking for other people, observing people on the bus platform, and watching the K-9 who was working. Tr. at 12.

5. Detective Williams then observed Defendant produce a cell phone and begin rapidly texting. Tr. at 12. He noticed Defendant would often look up from his phone to observe others but continued to rapidly text without looking at his phone. Tr. at 13. Defendant would look at his phone only briefly, but then continue rapidly texting while scanning the crowd. Tr. at 13. In the detective's opinion, Defendant was not actually texting. Tr. at 12-13.

6. After making these observations, Detective Williams approached Defendant, produced his police badge, identified himself as law enforcement, and asked if he could speak with Defendant. Tr. at 17. Defendant said "yes" and something about not doing anything wrong. Tr. at 17-18, 66.

7. Because the bus platform was congested, Detective Williams asked Defendant if he could step to the side so they could talk. Tr. at 18-20, 54-55; Gov't Ex. 3. During the hearing, the detective indicated Defendant consented or agreed to move with the detective to a nearby cement seating area to talk. Tr. at 18-20. The detective could not recall if Defendant verbally said "yes, I agree." Tr. at 55. He reiterated that Defendant followed him to the concrete bench seating area. Tr. at 55. The detective also stated Defendant never said anything such as "no," "I'm leaving," or "I don't want to speak with you." Tr. at 20.

3

8. Once by the cement seating area, Detective Williams asked Defendant where he was traveling and if he could see his bus ticket, which Defendant voluntarily produced. Tr. at 22-24, 54, 56; Gov't Ex. 7. The bus ticket indicated Defendant was traveling from St. Louis to Omaha, which confirmed what he told the detective. Tr. at 24, 54; Gov't Ex. 7.[2] When asked the purpose of his travel, Defendant said he was going to Omaha to visit his brother. Tr. at 24, 54.

9. After producing his bus ticket, Defendant opened a small green duffle bag he was carrying and began going through it. Tr. at 24, 57; Gov't Ex. 8. He said he was a barber, took barber equipment out of the bag, and showed it to the detective. Tr. at 24-25, 56-57, 65, 96. Detective Williams, as well as Detective Crump who was observing the encounter from a distance, noted Defendant's hands were shaking and he appeared nervous as he showed the barber equipment. Tr. at 27, 57, 95-96. Some barber equipment fell out of Defendant's hands, he picked it up, and it fell again. Tr. at 27, 57, 97. Defendant then placed the barber equipment back in his green duffle bag but did not fully close the bag. Tr. at 57.

10. When Detective Williams asked for identification, Defendant voluntarily provided his Missouri identification card. Tr. at 23, 54, 56; Gov't Ex. 7. The detective noticed Defendant's hand visibly shook when he provided his identification card. Tr. at 26. After confirming the names on the bus ticket and identification card matched, Detective Williams returned both items to Defendant. Tr. at 24-26.

11. When Defendant inquired as to why law enforcement contacted him, the detective informed him that law enforcement was looking for people carrying large quantities of narcotics, illegal firearms, or sizable quantities of illegal currency. Tr. at 26, 78. He asked Defendant if he

---

[2] The bus, which originated in New York and was traveling to Los Angeles, stopped in St. Louis before stopping in Kansas City. Tr. at 8-9, 11, 86.

had any of those items on his person or in his bags. Tr. at 26. Defendant said he did not. Tr. at 26.

12. During their conversation, Detective Williams noticed Defendant spoke rapidly, jumped from topic to topic, repeatedly stated he had not done anything wrong, said he was a barber, and wanted to know why he had been contacted. Tr. at 22, 26-27, 31-32.

13. Detective Williams asked to search Defendant's two bags – the green duffle bag and a Pittsburgh Steelers team logo backpack. Tr. at 27-30, 66; Gov't Exs. 8-9. Defendant did not answer the detective's question. Tr. at 28, 66.

14. He then asked Defendant if a K-9 could conduct a sniff check of the two bags. Tr. at 28, 64, 66. Defendant answered in the affirmative with words to the effect of "yes," "yeah," or "that would be fine." Tr. at 28, 64. His duffle bag and backpack were then placed on the cement seating area for the K-9 sniff. Tr. at 30, 64-65; Gov't Ex. 3.

15. Detective Garcia, who was onsite, was notified to have K-9 Zina conduct a sniff check of Defendant's two bags. Tr. at 28-29, 64, 86; Gov't Exs. 8-9. Less than one minute later, Detective Garcia arrived, and Zina conducted a sniff check of Defendant's two bags. Tr. at 29, 64, 86-87. Zina did not alert on the bags, and Detective Williams informed Defendant of this fact. Tr. at 30, 70, 86.

16. After the dog sniff, Detective Williams asked Defendant, "Straight up, can I search your bag, yes or no?" Tr. at 31, 70, 74. When he asked the question, the detective observed Defendant's Adam's apple bobbed up and down, he licked his lips, and he appeared to be nervous. Tr. at 31. In response, Defendant said, "do what you gonna do, yes." Tr. at 31, 70-74.

17. Detective Williams searched Defendant's green duffle bag and found a black semiautomatic handgun, an extended magazine, and blue Taser-style stun gun. Tr. at 32-34; 60;

Gov't Exs. 10-13.  He handcuffed Defendant and placed him under arrest for investigation of possessing a deadly weapon on a bus.  Tr. at 34.  Defendant asked if he was being arrested, and the detective answered in the affirmative.  Tr. at 34.

18.     Approximately five minutes elapsed between the time Detective Williams contacted Defendant and his arrest.  Tr. at 31, 59.  Up until the time Defendant was placed under arrest, Detective Williams did not make any physical contact with Defendant.  Tr. at 69-70.  During their encounter, the detective was calm, did not use a loud or commanding voice, stood an arm's length away, never blocked or prevented Defendant from moving or leaving, and never told Defendant he could not leave.  Tr. at 21, 27, 43-44, 65, 87-88, 96-97; Gov't Ex. 6.  At no time did Defendant ask to leave.  Tr. at 22, 43, 88, 97.

19.     Once Defendant was handcuffed, Detective Williams escorted him to an interview room inside the bus station.  Tr. at 34-36.  During the walk, Defendant made spontaneous statements about, among other things, a prior conviction.  Tr. at 35.

20.     Once in the interview room, Detective Williams inventoried the contents of Defendant's bags.  Tr. at 36-37.  From the green duffle bag, the detective removed a Ruger pistol (serial number 371309163), an extended magazine loaded with eight live rounds of .380 caliber ammunition, a blue Taser-style stun gun, and a digital scale with a green leafy substance on it.  Tr. at 39-42; Gov't Exs. 13, 19-24.

21.     While inventorying and documenting the contents of Defendant's bags, the officers did not ask Defendant any questions.  Tr. at 43.  Defendant, however, made incriminating statements.  Tr. at 42-43.  Once the inventory was completed, Defendant was read his Miranda rights.  Tr. at 45.  Defendant declined an interview.  Tr. at 45.

### III.  DISCUSSION

Defendant maintains he was illegally stopped and searched by law enforcement on August 7, 2019, and therefore, the firearm seized and his subsequent statements should be suppressed. Doc. 50 at 5-11.  The Government argues the encounter was consensual, and Defendant voluntarily consented to the search.  Doc. 58 at 8-14.  The Court first addresses whether the encounter was consensual and then examines whether Defendant voluntarily consented to the search.

### A. The Encounter Between Defendant and Detective Williams

The Fourth Amendment provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…" U.S. Const. amend. IV.  Whether the Fourth Amendment is implicated depends on the nature of the encounter between law enforcement and a citizen.  *See generally United States v. Mendenhall*, 446 U.S. 544, 553-55 (1980); *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968).  The Eighth Circuit recognizes three categories of police-citizen encounters: a consensual encounter, a *Terry* stop,[3] and full-scale arrest.[4]  *United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988).  At issue in this matter is whether the encounter between Detective Williams and Defendant was consensual.

Consensual encounters do not implicate the Fourth Amendment.  *See United States v. Drayton,* 536 U.S. 194, 200 (2002); *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions."); *United States v. Garcia*, 888 F.3d 1004, 1008 (8th Cir. 2018).  A consensual encounter "occurs when law enforcement officers merely approach an individual on the street" or other public place, "ask if he is willing to answer some question," and "a reasonable

---

[3] A *Terry* stop is a minimally intrusive seizure for a short period if the police have "articulable suspicion" that the person committed or is about to commit a crime. *United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988) (citation omitted).

[4] A full-scale arrest must be supported by probable cause.  *Id*. (citation omitted).

person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436; *Hernandez*, 854 F.2d at 297.[5] "The reasonable person test…is objective and 'presupposes an *innocent* person.'" *Drayton*, 536 U.S. at 202 (quoting *Bostick*, 501 U.S. at 438) (emphasis in original).

During a consensual encounter, law enforcement may ask an individual questions even if the officers have no basis for suspecting the individual of wrongdoing, ask to examine the individual's identification, and request consent to search the individual's luggage, provided the officers do not induce cooperation by coercive means. *See Bostick,* 501 U.S. at 434-35 (citations omitted); *Drayton,* 536 U.S. at 201. If, however, the questioning during a consensual encounter becomes "so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave," a seizure occurs, which implicates the Fourth Amendment. *United States v. Flores-Sandoval,* 474 F.3d 1142, 1145 (8th Cir. 2007) (quoting *United States v. Hathcock*, 103 F.3d 715, 718 (8th Cir. 1997)).

To determine whether an encounter is consensual or has "ripened into a seizure," the Court examines seven non-exclusive factors: whether law enforcement's positioning limited the person's freedom of movement, the number of officers present, the officers' display of weapons, physical touching of the person, the use of language or intonation indicating compliance is required, the officers' retention of the person's property, or the officers indicating the person is the focus of a particular investigation. *Garcia*, 888 F.3d at 1009 (quoting *United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012)); *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008). The analysis is fact intensive, and whether an encounter implicates the Fourth Amendment depends on the unique

---

[5] Relevant here, the Eighth Circuit has upheld consensual encounters between law enforcement and citizens at bus stations. *See*, *e.g.*, *United States v. Perdoma*, 621 F.3d 745, 749 (8th Cir. 2010); *United States v. Richardson*, 275 F. App'x 571, 572-73 (8th Cir. 2008); *United States v. Woods*, 213 F.3d 1021, 1022-23 (8th Cir. 2000).

facts of the case. *Aquino*, 674 F.3d at 923 (citation omitted). The Government bears the ultimate burden of proving the encounter was consensual. *Garcia*, 888 F.3d at 1008.

Here, Defendant exited a bus at the Kansas City bus station, a public place. Detective Williams approached Defendant, identified himself as law enforcement, produced his badge, and inquired if he could ask Defendant some questions. Defendant made no attempt to leave or avoid the encounter and agreed to answer the detective's questions. He then voluntarily moved to a cement seating area to speak with the detective. When Detective Williams asked to see his bus ticket and identification, Defendant voluntarily produced both documents. Detective Williams returned the items after his inspection. Defendant told the detective where he was traveling and the purpose of his travel. Defendant maintained possession of his bags, and at one point, he voluntarily opened a bag and showed barber equipment to the detective.

Except for Detective Garcia briefly bringing his K-9 to conduct a sniff check of Defendant's bags, only one officer was present during the encounter. Both Detective Garcia and Detective Williams were in plain clothes, and neither brandished a weapon. Law enforcement made no physical contact with Defendant. In fact, the detective stood an arm's length away. Defendant was not prevented from leaving, and his freedom of movement was not hindered. And, according to the evidence presented at the hearing, Defendant never asked to leave.

Throughout the encounter, Detective Williams spoke calmly with Defendant and did not raise his voice or indicate by the tone of his voice that compliance was required. There was no suggestion that Defendant was the particular focus of an investigation. Although Defendant did not respond to the detective's initial request to search his bags, he agreed to allow a K-9 sniff the bags. When the K-9 did not alert on the bags, Detective Williams informed Defendant of that fact.

The detective then asked to search Defendant's bags.  Additionally, Defendant, as examined *infra*, section III(B), agreed to a search of his bags.

Based on the evidence presented and upon careful consideration of the above-identified factors, the Court recommends a finding that the entire encounter between Defendant and Detective Williams was consensual through the time of his arrest for possessing a deadly weapon on a bus.[6]

**B.      Consent to Search**

To protect citizens from unwarranted government intrusion, the Fourth Amendment's reasonableness requirement generally requires police officers obtain a judicial search warrant, issued only upon a showing of probable cause, before searching private property.  *See Riley v. California*, 573 U.S. 373, 381-82 (2014) (citations omitted).  If a search warrant is not obtained, "a search is reasonable only if it falls within a specific exception to the warrant requirement."  *Id*. at 382 (citation omitted).  Voluntary consent to a search is an exception to the warrant requirement. *United States v. Esquivias*, 416 F.3d 696, 700 (8th Cir. 2005) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973)).

To establish voluntary consent to a search, "the Government must demonstrate by a preponderance of the evidence that consent was 'the product of an essentially free and unconstrained choice.'"  *United States v. Garcia-Garcia*, 957 F.3d 887, 895 (8th Cir. 2020) (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004)).  An individual

---

[6] One issue raised in Defendant's motion to suppress is law enforcement's failure to obtain video surveillance from the Kansas City bus station.  Doc. 50 at 7-8.  During the hearing on Defendant's motion, Detective Williams testified he verbally requested the Kansas City bus station's video surveillance from August 7, 2019, within five days of the encounter with Defendant.  Tr. at 45-46, 60-61.  He later learned Greyhound changed its policy and required a written request.  Tr. at 45-46, 61-62, 97-98.  On some unknown date, Detective Williams made a written request for the video surveillance.  Tr. at 46, 62-63.  In response, he was informed the requested video surveillance no longer existed because Greyhound only kept videos for thirty days.  Tr. at 46, 63.  Defense counsel also attempted to obtain the video surveillance but was informed it no longer existed.  Doc. 50 at 7.  Regardless, the non-existence of the video surveillance does not nullify or dispute the evidence presented during the hearing.

voluntarily consents to a search if, by his or her words and conduct, he or she causes a "reasonable person to believe" the individual "has knowingly and voluntarily consented, whether or not the person actually intends to consent." *Cedano-Medina*, 366 F.3d at 684-85; *see also Esquivias*, 416 F.3d at 700. When determining if an officer reasonably believed an individual knowingly and voluntarily consented to a search, courts consider the totality of the circumstances. *See United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007). The Eighth Circuit categorizes these factors as "(1) the nature of the interaction between the police and the defendant,[7] (2) the personal characteristics of the defendant,[8] and (3) the environment surrounding the defendant at the time he gave his consent."[9] *Garcia-Garcia*, 957 F.3d at 897 (citation omitted). "The factors should not be applied mechanically, and no single factor is dispositive or controlling." *United States v. Escobar,* 389 F.3d 781, 785 (8th Cir. 2004) (citation omitted).

Relevant to the Court's analysis, the encounter occurred in a public place and lasted fewer than five minutes. When approached, Defendant agreed to speak with the detective and voluntarily provided his bus ticket and identification to the officer. At no time did law enforcement make promises or misrepresentations, brandish weapons, or touch, physically intimate, or threaten Defendant. Instead, Detective Williams remained an arm's length away from Defendant and displayed a calm demeanor. Defendant was not restrained or prevented from leaving, and he never asked to leave. Although not asked to do so, Defendant chose to open his duffle bag, pull out

---

[7] When evaluating the nature of the interaction, courts have considered, among other things, the length of time the individual was detained and/or questioned before giving consent, whether law enforcement made promises or misrepresentations, and whether the individual was threatened, punished, or physically intimidated. *See United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006).

[8] These factors include, among others, the individual's age, intelligence, education, sobriety, experience with law enforcement, and whether the individual objected to the search or stood silently while the search was conducted. *See id*.

[9] Environmental factors include, *inter alia*, whether the individual was under arrest or in custody and whether the request to search and consent thereto occurred in a public or secluded place. *See id*.

barber equipment, and show it to the detective. While he did not respond to the detective's initial search request, Defendant consented to a K-9 sniffing his bags.

When asked if his bags could be searched, Defendant said, "do what you gonna do, yes." Detective Williams then began to search the green duffle bag. There is no evidence that Defendant tried to prevent the detective from getting his bag or looking through its contents. Furthermore, nothing in the record suggests Defendant said anything during the search indicating he did not consent to the search. When considering the totality of the circumstances, Defendant's words and conduct would cause a reasonable person to believe he knowingly and voluntarily consented to the search of his bags.

The crux of Defendant's motion to suppress rests on his response to the detective's search request. Doc. 50 at 9-10. Defendant does not dispute he said, "do what you gonna do, yes." But he contends "[t]he plain meaning of the words [he] used and the context in which they were said" establish he "clearly communicated his lack of consent to search" and would have led a reasonable person to believe he "did not want his bag to be searched." *Id*. Defendant argues his response coupled with the detective's alleged failure to tell him he could refuse consent or was free to go demonstrate his consent was not voluntary. *Id*. at 10.

Defendant cites two cases to bolster his argument. *Id*. at 9. Both cases are distinguishable. In *United States v. Escobar*, the Eighth Circuit found the defendant's acquiescence to the search – "Go ahead, you're going to do it anyway" – was tainted because law enforcement misrepresented that a K-9 gave a positive indication of drugs in her bags, the search occurred in a non-public place, and she was not advised she could refuse consent. 389 F.3d 781, 785-86 (8th Cir. 2004). The Court emphasized the officer's misrepresentation that the K-9 gave a positive alert for drugs

"communicated to [the defendants] there was probable cause to search and they had no choice but to permit." *Id.* at 786.

In *United States v. Worley*, the Sixth Circuit found the defendant's statement "You've got the badge, I guess you can" in response to a search request did not "unequivocally, specifically, and intelligently" indicate consent. 193 F.3d 380, 386 (6th Cir. 1999). But the Court's analysis did not rest solely on this statement. The Court also considered the officer's misunderstanding about the defendant's ticket and the officer's insistence that it was one-way when it was not "suggested to [the defendant] that further disagreement was futile." *Id*. at 386. In addition, the Court examined the defendant's "subjective belief that he had no choice but to comply with the [officer's] request to search the bag" as well as the defendant seeing the officers' badges, not assisting with the search, not making additional comments indicating "free and voluntary consent" while the officers searched his bags, and not being informed he could refuse consent. *Id*. at 386-87. Although the search occurred in an airport, a public place, the Court noted the unique context presented by air travel, which instills "nervousness" in individuals who, among other things, need to quickly make connections to continue their journeys. *Id*. at 387 (citation omitted). When considering the totality of the circumstances, the Court concluded the Government failed to meet its burden of establishing the defendant voluntarily consented to the search. *Id*.

Unlike *Escobar* and *Worley*, Detective Williams did not misrepresent the K-9's sniff check of Defendant's bags. Instead, he informed Defendant that the K-9 did not alert. Thus, Defendant was not led to believe the detective had probable cause to search his bags. Further, in requesting consent to search, Detective Williams did not issue any type of command or directive to Defendant, nor did he convey a message that compliance was required or that he had legal authority to conduct the search irrespective of whether Defendant granted consent. In addition, the search of

13

Defendant's bag occurred in public place, a bus station, and not in a crowded area. There was no misunderstanding as to Defendant's travel. Although there is no evidence as to what Defendant's subjective belief was, his response to the detective's search request is less ambiguous than the statements made in *Escobar* and *Worley*.

Rather, Defendant's response is more akin to other responses the Eighth Circuit has found sufficient to indicate consent. *See United States v. Lopez-Mendoza,* 601 F.3d 861, 866-67 (8th Cir. 2010) (finding a response of "go ahead" to a request to search a vehicle was sufficient indication of consent); *United States v. $117,920.00 in U.S. Currency,* 413 F.3d 826, 827-28 (8th Cir. 2005) (finding a response of "I guess if you want to" when asked for consent to search was sufficient to cause a reasonable person to believe consent had been given). Although Defendant prefaced his response with "do what you gonna do," he also specifically answered in the affirmative with "yes." And his "do what you gonna do" statement does not presume the officer can search the bag because he has "a badge" or he was "going to [search] it anyway." Furthermore, Defendant made no attempt to stop the search and made no comments while his bags were searched indicating he did not consent to the search. Simply put, there is no evidence in this case that Defendant was coerced in any fashion to agree to a search of his bags.

Upon consideration of the totality of the circumstances surrounding Defendant's response to the detective's search request, the Court recommends a finding that Defendant voluntarily consented to the search of his bags.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress (Doc. 50).

14
Case 4:19-cr-00278-BP   Document 69   Filed 09/29/21   Page 14 of 15

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

DATE: September 29, 2021
　　　　　　　　　　　　　　　　　　　　　　　　*/s/ W. Brian Gaddy*
　　　　　　　　　　　　　　　　　　　　　　　　W. BRIAN GADDY
　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE