IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 19-00278-01-CR-W-BP |
| | ) | |
| TAMOND E. THOMAS, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
AND DENYING DEFENDANT'S MOTION TO SUPPRESS</u>**

Defendant Tamond Thomas has been charged with one count of being a felon in possession of a firearm. He filed a Motion to Suppress, (Doc. 50), arguing that he was unlawfully detained and did not consent to a search of his belongings. The Honorable W. Brian Gaddy, United States Magistrate Judge, held a hearing on June 30, 2021, and subsequently issued a Report and Recommendation recommending that the Motion to Suppress be denied. (Doc. 69.)

The Court has conducted a *de novo* review of the Report and Recommendation as required by 28 U.S.C. § 636(b)(1). In particular, the Court has reviewed the parties' submissions before the hearing, the transcript and exhibits from the hearing, Defendant's objections to the Report and Recommendation and the Government's response. Having conducted this review, the Court adopts the Report as the Order of the Court and denies the Motion to Suppress; the Court's discussion is intended to augment, not supplant, Judge Gaddy's recommended findings and conclusions.

**I. BACKGROUND**

On August 7, 2019, three Kansas City, Missouri police detectives—Paul Williams, Antonio Garcia, and Justin Crump—were at a Greyhound Bus Station on Troost Avenue, looking

for individuals carrying narcotics, illegal currency, or firearms. Williams observed Defendant exiting a bus, and found Defendant's conduct suspicious; Defendant wore a hat and tilted his head so as to obscure his face, scanned the crowd at the station with his eyes, and pulled out a cell phone on which he appeared to be typing without looking at the screen. Williams approached Defendant and asked if he could speak with him. Defendant said "yes," and Williams asked Defendant to step to the side away from the crowd. Defendant and Williams moved to a nearby seating area. At no point did Defendant say anything that could be characterized as a refusal to speak with Williams. Moreover, at no point during the encounter—at least until Defendant was arrested—did Williams make physical contact with Defendant, block him from leaving, or speak in a threatening manner.

Williams began by asking Defendant some general questions about his travel, and Defendant indicated he was traveling from St. Louis to Omaha to visit his brother. Defendant then opened a duffle bag he was carrying of his own accord and produced hair-cutting equipment, explaining that he was a barber; Defendant's hands were shaking so badly that he dropped some of his equipment. Defendant also spoke rapidly and repeatedly stated that he had done nothing wrong. At one point, Defendant asked why Williams had approached him, and Williams indicated that he and the other detectives were looking for people carrying narcotics, firearms, or illegal currency.

Williams then asked Defendant whether a K-9 unit could perform a sniff test on the duffle bag and another piece of luggage. Defendant verbally assented, and the K-9 unit performed the sniff test without alerting. Williams told Defendant the K-9 had not alerted, and then asked whether he could search Defendant's bag, "yes or no?" Defendant responded "do what you gonna do, yes." Williams searched the duffle bag and found a semiautomatic handgun, a magazine, and

an electric stun gun. Williams then arrested Defendant for possessing a deadly weapon on a bus, told Defendant he was under arrest, and handcuffed him.

Williams then walked Defendant to an interview room in the bus station. Defendant spontaneously volunteered that he had previously been convicted of a crime. In the interview room, Williams inventoried Defendant's bags, confirming the presence of the handgun, magazine, and stun gun. During this process, none of the detectives asked Defendant anything, but Defendant made incriminating statements. After the inventory was completed, the detectives read Defendant his *Miranda* warnings. Defendant declined to speak with them any further.*

## II. DISCUSSION

In the R&R, Judge Gaddy divided the events that led to Defendant's arrest into two parts. The first part consists of Defendant's initial encounter with Williams, where Williams asked Defendant whether he would be willing to talk, and led him away to the seating area. Judge Gaddy concluded that this encounter was consensual, and hence, did not implicate Defendant's Fourth Amendment rights. The second part consists of the K-9 sniff test and, later, the search of Defendant's bags. Judge Gaddy concluded that Defendant also voluntarily consented to these actions, and hence, that they were not unlawful.

Defendant objects to Judge Gaddy's conclusions as to both parts. Regarding the first part, Defendant admits that he agreed to speak with Williams, but argues that his consent was not truly voluntary. (Doc. 70, pp. 3–4.) An encounter involving a law enforcement officer "is transformed into a seizure when, considering all of the circumstances, a reasonable person would believe that

---

* The basis for these facts is testimony at the hearing on Defendant's motion to suppress. The Greyhound bus station had video surveillance footage which Williams attempted to obtain, but did not submit a written request for the footage until it had already been routinely deleted. Defendant suggests in his objections that there was no video footage to collaborate the detectives' testimony, (Doc. 70, p. 1), but as Judge Gaddy observed, the Government did not need to present video evidence to carry its burden of proof. (Doc. 69, p. 10 n.6.)

he is not free to leave." *United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988). By contrast, when "law enforcement officers merely approach an individual . . . and ask if he is willing to answer some questions," the "encounter . . . is consensual [and] does not constitute a seizure." *Id*. Courts consider seven non-exclusive factors in determining whether a reasonable person would not feel free to leave: whether police officers "position[ed] themselves in a way to limit the person's freedom of movement," the number of officers, "the display of weapons by officers," "physical touching," commanding language, "retention of the person's property," and "indication [that] the person is the focus of a particular investigation." *United States v. Garcia*, 888 F.3d 1004, 1009 (8th Cir. 2018) (citation omitted).

Here, Williams was the only officer who interacted with Defendant during most of the encounter, and Williams did not limit Defendant's freedom of movement, display a weapon, physically touch Defendant, or use commanding language. Moreover, Williams did not retain Defendant's property until the K-9 sniff occurred, and while he indicated generally that the detectives were investigating possible crimes, he did not indicate that Defendant was the focus of the investigation. Given these facts, under the totality of the circumstances, Williams's initial encounter with Defendant was consensual.

The next question is whether Williams's search of Defendant's baggage was consensual. "To show that a person consented to a search, the Government must demonstrate by a preponderance of the evidence that consent was 'the product of an essentially free and unconstrained choice.'" *United States v. Garcia-Garcia*, 957 F.3d 887, 895 (8th Cir. 2020) (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004)). Courts consider a variety of factors to assess consent, including:

> the defendant's age, education, intelligence, sobriety, and experience with the law; and context, such as the length of questioning, the substance of any discussion preceding the

4

consent, whether the defendant was free to leave, and whether the defendant's contemporaneous reaction to the search was consistent with consent.

*Garcia*, 888 F.3d at 1009 (citation and ellipses omitted; cleaned up). Moreover, the relevant question is not whether the defendant "subjectively consented, but rather, whether a reasonable officer would believe consent was given." *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009).

Defendant does not dispute (at least for purposes of his objection to the R&R) that he said "do what you gonna do, yes" in response to Williams asking whether he could search Defendant's bag. (Doc. 70, p. 5.) Instead, Defendant argues that the totality of the circumstances do not indicate that he voluntarily consented to the search. He points out that his alleged acquiescence is similar to statements that did not constitute valid consent in other cases. (Doc. 70, p. 5.) For instance, in *United States v. Escobar*, the Eighth Circuit held that a defendant who said "[g]o ahead, you're going to do it anyway" in response to a request to search his bag had not voluntarily consented to the search. 389 F.3d 781, 783 (8th Cir. 2004). But in that case, police officers had affirmatively misrepresented to the defendant that a drug-sniffing dog had alerted on his bag, which made his consent irrelevant. *Id*. at 786. Here, by contrast, Williams expressly told Defendant that the K-9 had *not* alerted before asking to search the bag. And, generally, the Court agrees with Judge Gaddy that "do what you gonna do, yes" is a "contemporaneous reaction to the search" that "was consistent with consent." *Garcia*, 888 F.3d at 1009; *see also United States v. $117,920.00 in U.S. Currency*, 413 F.3d 826, 827–28 (8th Cir. 2005) ("I guess if you want to" was sufficient to indicate consent).

And in addition to Defendant's verbal agreement, the other factors are also consistent with consent. Defendant is an adult and there is no evidence he was intoxicated during the encounter with Williams; moreover, he presumably has at least some experience with law enforcement in

light of his alleged previous felony conviction.  The encounter occurred in a public place and was relatively short in duration, and for the reasons discussed above, there is nothing to indicate that Defendant was not free to leave.  Therefore, the Court concludes that Defendant's consent to search his bag was voluntary.

Finally, in Defendant's initial Motion to Suppress, he suggested that any statements he made after his arrest were the product of an unlawful detention because the evidence that led to the arrest was seized illegally.  As a result, he contended that those statements should be suppressed as well.  (Doc. 50, pp. 1–2.)  Having concluded that the evidence leading to Defendant's arrest was obtained lawfully, the Court rejects this argument as well.

### III.  CONCLUSION

For the foregoing reasons, the Court adopts Judge Gaddy's Report and Recommendation, and **DENIES** Defendant's Motion to Suppress.  (Doc. 50.)


**IT IS SO ORDERED.**


/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
DATE:  October 19, 2021              UNITED STATES DISTRICT COURT